**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MARIE B. LOWE, | ) |
| | ) |
| Plaintiff, | )    2:19-cv-00980-RJC |
| | ) |
| vs. | ) |
| | ) |
| CSENGE ADVISORY GROUP, ROGER P. | )    Judge Robert J. Colville |
| BEDILLION,  AMERICAN GENERAL | ) |
| LIFE INSURANCE COMPANY,  THE | ) |
| GUARDIAN LIFE INSURANCE | ) |
| COMPANY OF AMERICA,  PARK | ) |
| AVENUE SECURITIES LLC,  FSC | ) |
| SECURITIES CORPORATION, | ) |
| RELIASTAR LIFE INSURANCE | ) |
| COMPANY,  VOYA FINANCIAL | ) |
| SERVICES COMPANY,  VOYA | ) |
| FINANCIAL, INC. f/k/a ING U.S., INC., | ) |
| VOYA FINANCIAL PARTNERS, LLC, | ) |
| MARTIN VALENTIC,  LIFETIME | ) |
| FINANCIAL GROWTH, LLC,  ROBERT | ) |
| W. BAIRD & CO. INC. f/k/a J.J.B. | ) |
| HILLIARD, W.L. LYONS d/b/a HILLIARD | ) |
| LYONS, | ) |
| | ) |
| | ) |
| Defendants. | ) |

**<u>MEMORANDUM OPINION</u>**

Robert J. Colville, United States District Judge

      Before the Court are three Motions to Dismiss filed by six of the fourteen Defendants in

this matter.  The Motions at issue were filed by Defendants: (1) J.J.B. Hilliard, W.L. Lyons, LLC,

and Robert W. Baird and Co. (collectively, "Hilliard") (ECF No. 62); (2) Voya Financial, Inc. f/k/a

ING U.S., Inc., Voya Financial Partners, LLC, and Voya Financial Services Company,[1]

---

[1] Voya avers that there is no such entity called Voya Financial Services Company, and that Voya is not aware of any
affiliated entity with that name.  Voya Br. in Supp. Ex. B at ¶ 4, ECF No. 78.

(collectively, "Voya") (ECF No. 77); and (3) ReliaStar Life Insurance Company ("ReliaStar") (ECF No. 79).[2]   The Moving Defendants' Motions individually assert that the claims set forth against the Moving Defendants in the operative First Amended Complaint (the "Complaint") (ECF No. 51) filed by Plaintiff Marie B. Lowe ("Lowe") in this matter should be dismissed for failure to state a claim.  Specifically: (1) Hilliard seeks dismissal of Counts X, XI, XVI, and XVII; (2) Voya seeks dismissal of Counts X, XII, and XVII; and (3) ReliaStar seeks dismissal of Counts X, XII, and XVII.  These Motions have been fully briefed, and are ripe for disposition.[3]

## I.      Factual Background & Procedural History

This case involves the acquisition of four life insurance policies over the course of approximately fourteen years.  Lowe asserts that none of these insurance policies was remotely appropriate for her needs, and that they were acquired for an improper purpose that ultimately resulted in the loss of Lowe's life savings.  In this action, Lowe seeks recovery against her longtime friend and investment adviser and/or insurance agent/broker, Roger P. Bedillion ("Bedillion"), who allegedly planned and facilitated the acquisition of each of these insurance policies.  Lowe has also sued another insurance agent/broker, Valentic, for his alleged involvement in the acquisition of two of the insurance policies at issue.  Lowe also seeks recovery against a number of business entities that had a relationship with Bedillion and/or Valentic, were involved with the issuance of the insurance policies at issue, or both.  In the Complaint, Lowe sets forth the following allegations:

---

[2] The Court shall refer to Hilliard, ReliaStar, and Voya collectively as the "Moving Defendants."
[3] The Court notes that the following Defendants have also filed Motions to Dismiss in this matter that are ripe for disposition: (1) The Guardian Life Insurance Company of America ("Guardian"), Park Avenue Securities, LLC ("Park Avenue"), and Lifetime Financial Growth, LLC ("Lifetime") (collectively, "Guardian/Park/Lifetime"); (2) Csenge Advisory Group, LLC ("Csenge") (ECF No. 66); (3) Martin Valentic ("Valentic") (ECF No. 69); and (4) American General Life Insurance Company ("American General") (ECF No. 71).  At this time, the Court will only address the Motions to Dismiss filed by Hilliard, ReliaStar, and Voya to the extent they assert that Lowe's federal securities fraud claims (Count X) should be dismissed.  All other issues raised in any Defendant's Motion to Dismiss will be held in abeyance pending this Court's resolution of the federal securities fraud claims before it.

Bedillion was a registered investment adviser registered with: (1) Hilliard from June 2002 until January 2004; (2) FSC from October 2006 until April 2018; and (3) Csenge from September 2011 until April 2018. Compl. ¶ 4, ECF No. 51. At the times relevant herein, Hilliard was a full-service wealth management firm. *Id.* at ¶ 11. ReliaStar is a life insurance company and a subsidiary of Voya. *Id.* at ¶ 10. Voya Financial, Inc. f/k/a ING US, Inc. is a financial, retirement, investment, and insurance company, and is the parent of Voya Holdings, Inc., which, in turn, is the parent of ReliaStar. *Id.* at ¶ 12. Voya Financial Partners, LLC is a broker/dealer with approximately 928 registered financial professionals nationwide whose primary clients are individuals. *Id.* at ¶ 13. Valentic is a registered investment adviser, and was: (1) an agent of Guardian from May 2001 until April 2015; and (2) a registered representative of Park Avenue from April 2005 until April 2015. *Id.* at ¶ 14. During the timeframe relevant herein, Valentic worked at Lifetime. *Id.* at ¶ 15. Guardian is a life insurance company, and Park Avenue is an indirect wholly owned subsidiary of Guardian that acts as the broker/dealer for agents of Guardian. *Id.* at ¶¶ 7-8. Lifetime is a privately-owned wealth management firm that serves as a general agent of Guardian. *Id.* at ¶ 15. Csenge is a Registered Investment Adviser registered in the Commonwealth of Pennsylvania. *Id.* at ¶ 5. FSC is a broker/dealer that is registered to do business in Pennsylvania. *Id.* at ¶ 9. American General is a life insurance company registered to do business in Pennsylvania. *Id.* at ¶ 6.

Lowe and her late husband, Harold Lowe ("Harold"), met Bedillion in 1979 and began a banking and savings relationship with PNC, Bedillion's employer at that time, through Bedillion. Compl. ¶ 39, ECF No. 51. Lowe and Harold worked with Bedillion until Harold's death in 2001, and, during the entirety of this period, Harold remained committed to pursuing only conservative investment options. *Id.* at ¶¶ 49-54. In addition to this professional relationship, Lowe and Harold

became close personal friends with Bedillion and Bedillion's wife, and the couples travelled together and socialized together. *Id.* at ¶ 51. During this time period, the Lowes considered Bedillion to be trusted adviser and friend. *Id.* While Harold was in the hospital in 2001, and briefly before he passed away, Bedillion made arrangements for Harold to create a complicated estate plan involving multiple trusts which essentially gave Bedillion the ability to take control of a significant portion of Lowe's money after Harold's death and to, eventually, advise and promote an investment strategy which would benefit Bedillion. *Id.* at ¶ 53. At the time that Harold passed away, Lowe's children were adults and employed. *Id.* at ¶ 55. At that time, Lowe had two paying jobs, owned her house mortgage-free, had accumulated approximately $800,000 in savings, and was the beneficiary of almost $200,000 in life insurance proceeds payable on Harold's passing, which proceeds were placed into a trust in which Lowe was a beneficiary. *Id.* at ¶ 56.

Following Harold's death, Lowe relied on Bedillion for all matters related to her financial affairs and ceded control of her investments to him. Compl. ¶ 62, ECF No. 51. Bedillion did not provide options to Lowe for her investment strategies; but, rather made decisions on Lowe's behalf, and obtained her signatures to execute on those decisions only when necessary. *Id.* at ¶ 63. As opposed to the conservative investment approach utilized and preferred by the Lowes prior to Harold's passing, Bedillion proceeded to advise Lowe to participate in unsuitable investment options that involved elements of risk, cost, expense, fluctuation, and a lack of congruity with Lowe's needs and objectives. *Id.* at ¶ 67.

### A.  The ING Policies

In 2003, Bedillion promoted a new savings strategy that relied upon life insurance products to Lowe. Compl. ¶ 70, ECF No. 51. Lowe avers that Bedillion, an investment adviser licensed at that time with Hilliard, recommended a strategy that directed Lowe to purchase two variable life

insurance policies from ING/ReliaStar, despite Lowe being "a widow who had significant savings, two financially-independent children, no debt, a future teacher's pension, a future military pension, social security, and more importantly, being effectively uninsurable due to her Multiple Sclerosis misdiagnosis."[4]  *Id.* at ¶ 71.  Bedillion advised Lowe that the purpose of purchasing these life insurance policies was to accumulate significant cash surrender value for future retirement purposes and to provide a death benefit payable to her children upon her death.  *Id.* at ¶ 74.  In so advising, Bedillion provided Lowe with false assurances and information regarding a fraudulent and unrealistic rate of return in order to encourage Lowe to utilize the proposed strategy.  *Id.* at ¶ 79-80.  Bedillion's proposed strategy required that funds be removed from Lowe's savings every year to pay premiums.  *Id.* at ¶ 78.  Bedillion did not provide Lowe with accurate information and/or disclosures regarding this strategy, and, because Lowe was uninsurable, Bedillion was required to apply for two "second to die" life insurance policies, with each including Lowe and one of her two children, Lesa or Larry Lowe.  *Id.* at ¶ 81-82.  After Lowe signed the blank applications for the insurance policies, Bedillion completed the applications and made several false representations in doing so.  *Id.* at ¶¶ 88; 96-97; 102-03.

Bedillion, while working at PNC Bank as a licensed representative of Hilliard, and as an agent with ING[5] and its distributor/subsidiary ReliaStar, ultimately submitted two applications signed by Lowe, and Larry and Lesa respectively, for life insurance policies with a base face amount of $4,664,000 with an annual premium of $40,000 with respect to Larry and a base face amount of $5,054,000 with an annual premium of $40,000 with respect to Lesa.  Compl. ¶¶ 93-94; 100; 129, ECF No. 51.  The applications identified Bedillion as an agent of Hilliard.  *Id.* ¶ 101. Lowe's annual income listed on the applications was $68,000, Larry's annual income was listed

---

[4] Lowe was incorrectly diagnosed with multiple sclerosis in 1998. Compl. ¶ 69, ECF No. 51.
[5] Lowe avers that "ING was later acquired by, or merged with, Voya."  Compl. ¶ 129 n.2, ECF No. 51.

as $15,000, and Lesa's annual income was represented as being $30,000.  *Id.* at ¶ 91.  The purposes listed for the acquisition the theses policies were "family protection" and "retirement planning." *Id.* at ¶ 97.  Bedillion failed to utilize any of the applications' requirements that were intended to protect the consumer during the application process.  *Id.* at ¶ 108.

An ING and ReliaStar representative reached out to Bedillion after receiving the applications for life insurannce and inquired as follows: "The applicant indicates that she has an annual income of $55,000 and a net worth of $1,000,000.  Please advise how you arrived at the need for a total of $9,718,000.  Is there more financial information?"  *Id.* at ¶ 109.  Bedillion, without consulting Lowe, replied to this message with false statements regarding the purpose of the insurance, as well as Lowe's potential sources of income and ability to pay for the insurance. *Id.* at ¶¶ 110-19.  Some of this supplemental information was inconsistent with the information that had already been provided ING and ReliaStar in the applications for life insurance.  *Id.* at ¶ 120; 122.  ReliaStar ultimately issued two policies (the "ING Policies") to Lowe, with the ING Policies having face amounts of $4,664,000 and $5,054,000, and with each requiring an upfront payment of $40,000, and annual premium payments of $40,000 thereafter.  *Id.* at ¶¶ 129-36.

Lowe avers that the ING policies were not suitable for her needs because the "second to die" feature could not provide family protection because the feature "would defer payment of death benefits until after the children co-owners were deceased and, if anything, would provide only a windfall benefit to the final surviving sibling co-owner if those siblings were able to support the policies with premium payments after [Lowe's] intended retirement depletions occurred."  Compl. ¶ 98, ECF No. 51.  Lowe further avers that the ING policies were "overfunded variable life insurance policies" that "would deplete a lifetime of savings to support a strategy that offered no substantive benefits to [Lowe]."  *Id.* at ¶ 138.  Lowe also avers that Hilliard, ING, and ReliaStar

knew or should have known that the ING Policies were not appropriate for Lowe and that Bedillion had submitted false information in the application and underwriting process. *Id.* The ING Policies are life insurance policies with securities features that provide for huge death benefits, which in turn meant that the target premiums, which determine the extent of Bedillion's commission, were also expensive, resulting in higher commissions for Bedillion. *Id.* at ¶¶ 127; 139-40. In addition, the ING Policies, which were variable products, "allowed Bedillion to continue to earn legacy commissions, or 'trails,' on the [ING Policies'] investment features." *Id.* at ¶ 140. Lowe avers that she did not need life insurance, and that she was fraudulently, deceptively, and illegally manipulated into obtaining the ING Policies by Bedillion, who was motivated solely by his intent and desire to earn large commissions. *Id.* at ¶¶ 143-44. All premium payments for the ING Policies were paid by Bedillion via funds withdrawn from Lowe's investment accounts. *Id.* at ¶ 148.

### B.  The Guardian Policy

Approximately five years after the ING Policies were issued, Bedillion scheduled a meeting with Lowe wherein Bedillion advised Lowe that the ING Policies were too expensive, and recommended that Lowe take the cash value from the ING Policies and fund a new policy that was purportedly less expensive. Compl. ¶ 149, ECF No. 51. Lowe again avers that Bedillion's recommendation was merely pretext to generate additional commissions for himself. *Id.* At that time, Lowe had paid approximately $400,000 into the ING Policies, which had approximately $270,000 in cash value. *Id.* at ¶ 150. In late 2009, Lowe met with Bedillion and Valentic, who were acting as agents for Guardian at that time, in their Washington, Pennsylvania office to listen

to their proposal for replacement of the ING Policies with a new insurance policy.[6]  *Id.* at ¶¶ 151-52.  Bedillion and Valentic, working together with a commission-splitting arrangement, advised that the ING Policies were too expensive, despite the fact that the front-end costs for the ING Policies had already been paid, and recommended the acquisition of a new life insurance policy on the basis that the new policy would be less expensive than the ING Policies and would accumulate cash value much faster because it had a lower death benefit.  *Id.* at ¶¶ 153-55.  Bedillion and Valentic advised that this strategy would involve terminating the ING Policies and transferring the cash value of those policies to a new insurance policy.  *Id.* at ¶¶ 157-59.

In late 2009, Lowe executed an application for insurance from Guardian that would replace the $9,718,000 of insurance from the ING Policies with a $2,000,000 whole life insurance policy issued by Guardian.  Compl. ¶ 160, ECF No. 51.  Guardian issued this whole life insurance policy (the "Guardian Policy") to Lowe on January 1, 2010.  *Id.* at ¶ 162.  As opposed to annual payments of $80,000 for the ING Policies, the Guardian Policy required seven annual payments of $68,000.  *Id.* at ¶ 161.  Bedillion and Valentic, without informing Lowe and contrary to their representations to her, did not surrender the ING Policies, and instead arranged for the ING Policies to go into "premium offset," which refers to "a situation where the insured stops paying life insurance premiums and instead relies upon the cash value of the policy to pay the premiums."  *Id.* at ¶¶ 163-64.  Because the ING Policies were only a few years old and the premium payments had been dedicated to upfront costs and commissions, the ING Policies did not have enough cash value to fulfill the premium offset strategy, and would instead deplete the entirety of the $270,000 of cash

---

[6] Lowe alleges that Guardian, Valentic, and Bedillion never provided the subsequently acquired insurance policy to Lowe and never provided a copy of the application for this policy to Lowe, and that she is thus unable to provide the exact date of this meeting.  Compl. ¶ 151 n.3, ECF No. 51.

value that the ING Policies had attained, a fact that Bedillion did not reveal to Lowe. *Id.* at ¶¶ 165-66.

Following the acquisition of the Guardian Policy, Lowe received statements from ING and ReliaStar, and took them to Bedillion, who confirmed that the ING Policies were working as intended and that "everything was going according to plan" and who further convinced Lowe to leave the ING/ReliaStar statements with him. Compl. ¶¶ 167-68, ECF No. 51. The premium offset plan allowed Bedillion to continue to collect commissions from the ING Policy renewals, which were significant, as well as commissions on variable life insurance investment features. *Id.* at ¶ 170. Because the cash surrender values of the ING Policies were insufficient to support the continuation of insurance coverage, "the policy costs and expenses began to rapidly erode the cash value of each policy such that not only were the policies unable to provide any death benefit to [Lowe], but, in addition, the proposed income supplement feature was being dissipated from within by the internal costs and expenses." *Id.* at ¶ 172. At the time of the issuance of the Guardian Policy, Lowe, who had a yearly income of less than $68,000, owned a total amount of life insurance in the amount of approximately $12,000,000 which required yearly premium payments of $147,000. *Id.* at ¶ 174.

Valentic and Bedillion used Lowe's savings, and not the cash surrender value of the ING Policy as planned, to pay the Guardian Policy's premiums. Compl. ¶ 176, ECF No. 51. Lowe avers that Valentic and Bedillion were, at the time of the acquisition of the Guardian policy, engaging in an insurance "twisting" scheme, whereby they advised clients to roll over their insurance policies and/or purchase unnecessary or exorbitant life insurance policies so that Bedillion and Valentic, as brokers/agents, could obtain large and unwarranted commissions. *Id.* at ¶ 178. Lowe further avers that Guardian and Park Avenue failed to make adequate inquiry

during the underwriting process as to whether a $2,000,000 life insurance policy was appropriate for Lowe.  *Id.* at ¶ 181.  At the time of the acquisition of the Guardian Policy, Bedillion was listed on the application as a writing agent, was a registered representative of FSC, and was an investment adviser for Csenge.  *Id.* at ¶ 183.  At that time, Valentic was also listed as a writing agent on the Guardian Policy, was a registered representative of Guardian and Lifetime, and an investment adviser for Park Avenue.  *Id.* at ¶ 184.  Lowe did not know that her savings were being depleted to pay the Guardian Policy's premiums, and any question respecting the payment of premiums was answered with false information.  *Id.* at ¶¶ 186-87.  Without consulting Lowe, Bedillion and Valentic arranged for the modification of the Guardian Policy in 2014 such that the Guardian Policy focused more on the death benefit and less on cash value.  *Id.* at ¶¶ 190-93.  This modification resulted in reduced premiums in exchange for the purchase of "paid up additions," which in turn impaired the seven total premium payment feature of the Guardian Policy which at that time was halfway complete.  *Id.* at ¶¶193-94.  Lowe avers that these modifications were intended to manipulate Lowe's funds in a way that allowed Bedillion and Valentic to continue to maintain the ING Policies and the Guardian Policy through misrepresentations.  *Id.* at ¶ 195.

### C.  The AIG Policy

In 2016, Bedillion recommended that Lowe replace the Guardian Policy through a tax-free rollover of the Guardian Policy's cash surrender value as an initial upfront payment for a new life insurance policy from American General (the "AIG Policy").  Compl. ¶ 196, ECF No. 51.  At that time, Lowe was close to full retirement, was living on the fixed income from her pensions, and her children had become much more financially independent.  *Id.*  The AIG Policy's face value was $2,000,000.  *Id.* at ¶ 197.  At the time of the acquisition of the AIG Policy, Bedillion informed Lowe that the ING Policies were still in force, that the ING Policies were self-sustaining in

accordance with prior strategies, and that the ING Policies had maintained limited cash value. *Id.* at ¶ 199. Bedillion did not reveal that he had left all of the cash value in the ING Policies such that the cash value would be depleted over time. *Id.* at ¶¶ 199-200.

Bedillion advised Lowe that the AIG Policy would have an annual premium of $36,036 in perpetuity. *Id.* at ¶ 202. While this premium is lower than the Guardian Policy's premium, the Guardian Policy required only seven total payments, six of which had been paid at that point. *Id.* The AIG Policy also required an upfront premium payment of $250,000. *Id.* at ¶ 204. While explaining the AIG Policy to Lowe, Bedillion concealed the fact that the AIG Policy's expenses were higher than the $36,036 premium payments would indicate, and further concealed that the Section 1035 rollover of the cash surrender value in the Guardian Policy to the AIG Policy would result in the AIG Policy having no cash surrender value. *Id.* at ¶¶ 205-06. As a result, Lowe would lose more than $260,000 of accumulated cash surrender value from the Guardian Policy and be required to pay annual premium to maintain a policy that had no cash surrender value. *Id.* at ¶ 207; 224. Lowe questioned Bedillion regarding his decision to invest in further life insurance products, to which Bedillion knowingly misrepresented that the AIG Policy was a good savings vehicle that had a lower premium for the same amount of life insurance. *Id.* at ¶¶ 208-09. Lowe avers that American General, FSC, and Csenge failed to provide the proper oversight during the underwriting process, *id.* at ¶ 212, and that Guardian failed to intercede with corrective action despite awareness that Valentic and Bedillion had participated in twisting schemes with respect to other clients, *id.* at ¶ 214.

The first annual premium payment for the AIG Policy was due in March 2018, and Lowe contacted Bedillion because she was unable to personally make the payment. Compl. ¶¶ 219-20, ECF No. 51. Bedillion and Lowe decided to make the first payment from her trust, and to take

steps to unwind Lowe's individual retirement account to make future payments. *Id.* at ¶¶ 221-22. Because payments were made using the trust, they were taxable to Lowe, and she received notices from the Internal Revenue Service because Bedillion, who prepared her taxes, did not issue the appropriate forms from the trust with respect to the trust distributions. *Id.* at ¶ 226. Thereafter, Lowe sought to meet with Bedillion, who repeatedly avoided interaction with her. *Id.* at ¶¶ 227-31. Lowe met with a new investment adviser in late 2018 who advised her that her investment history contained irregularities and who, in January 2019 following a full investigation of Lowe's investment history, identified potential inappropriate activities and further advised Lowed to seek independent legal advice. *Id.* at ¶¶ 233-34. Lowe avers that it was only at this point that she discovered that Bedillion and the other Defendants had engaged in illegal activity. *Id.* at ¶ 240. Lowe, relying on knowingly false representations made by Bedillion and Valentic, paid more than $1,000,000 of her life savings to pay for life insurance premiums for policies that were neither necessary nor suitable for Lowe. *Id.* at ¶ 246. Lowe avers that, had "she placed her money into proper investments and earned only a conservative annual return on her investment, today she would have more than $1,700,000 of savings." *Id.* at ¶ 252.

With respect to Bedillion's and Valentic's relationships with the various entity Defendants, Lowe alleges that: (1) "Bedillion was a registered representative of and/or broker under Hilliard when he sold the ING Policies to [Lowe] in 2003;" (2) "Bedillion was a registered investment adviser under FSC and Csenge when he sold the Guardian and AIG Policies to [Lowe] in 2010 and 2017;" (3) "Bedillion was an agent of ING and ReliaStar when he sold the ING Policies in 2003;" (4) "Bedillion was an agent with Guardian when he and Valentic sold the Guardian Policy to [Lowe] in 2010;" (5) "Bedillion was an agent for AIG when he sold the AIG Policy to [Lowe] in 2017;" (6) "Bedillion was employed as a registered representative of FSC and as a registered

investment adviser with FSC and Csenge when he sold the Guardian Policy and AIG Policy;" (7) "Valentic was an agent with Guardian when he and Bedillion sold the Guardian Policy to [Lowe] in 2010;" and (8) "Valentic was a registered representative of Park Avenue when he sold the Guardian Policy to [Lowe]."  Compl. ¶¶ 254-62, ECF No. 51.

Lowe filed her original complaint in the Court of Common Pleas of Washington County, Pennsylvania on July 1, 2019.  Notice of Removal ¶ 2, ECF No. 1.  Valentic removed this action to this Court on August 9, 2019 pursuant to 28 U.S.C. §§ 1441 and 1446 asserting that this Court has subject matter jurisdiction in this matter pursuant to 28 U.S.C. §1331.  Lowe filed her operative First Amended Complaint on October 18, 2019.  The Moving Defendants filed their Motions to Dismiss on either December 19, 2019 or December 20, 2019.  The Court notes that FSC filed an Answer (ECF No. 61) to the Complaint on December 19, 2019, and that Bedillion filed an Answer (ECF No. 68) to the Complaint on December 20, 2019.

## II.    Legal Standard

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint.  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff.  *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).  While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A "formulaic recitation of the elements of a cause of action will not do."  *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The Supreme Court of the United States has explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* (quoting *Twombly*, 550 U.S. at 556) (internal citations omitted).

The United States Court of Appeals for the Third Circuit instructs that "a court reviewing the sufficiency of a complaint must take three steps." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). The court explained:

> First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth." Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

*Connelly*, 809 F.3d at 787. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (internal citations omitted).

In addition to reviewing the facts contained in the complaint, a court may consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994).

When a document integral to or relied upon in the complaint is included, the court may also consider that document. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The United States Court of Appeals for the Third Circuit has explained:

> Pursuant to Rule 9(b), a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the "precise misconduct with which [it is] charged." *Lum v. Bank of America*, 361 F.3d 217, 223–224 (3d Cir.2004). To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.

*Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).

"If a plaintiff requests leave to amend a complaint vulnerable to dismissal before a responsive pleading is filed," a court must permit amendment unless it would be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). "When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." *Grayson*, 293 F.3d at 108.

## III.    Discussion

In their Motions to Dismiss, Hilliard, ReliaStar, and Voya each assert that Lowe's federal securities fraud claims[7] should be dismissed with prejudice because such claims are time-barred by the applicable limitations periods provided by 28 U.S.C. § 1658(b). Hilliard Br. in Supp. 4, ECF No. 63; ReliaStar Br. in Supp. 5, ECF No. 80; Voya Br. in Supp. 5, ECF No. 78. As noted

---

[7] Which were collectively asserted in Count X of the Complaint, along with securities fraud claims under Pennsylvania law, against the Moving Defendants.

in the Replies filed by Hilliard, ReliaStar, and Voya, Lowe fails to address these assertions in any material respect, and instead focuses on equitable tolling principles, which are inapplicable to federal securities fraud claims, in addressing the Moving Defendants' assertions that Lowe's federal securities fraud claims are time-barred.[8] *See* Hilliard Reply 4, ECF No. 96; ReliaStar Reply 1, ECF No. 101; Voya Reply 2, ECF No. 100.  In support of her claims for violation of the Securities and Exchange Act of 1934, Lowe asserts in the Complaint that Hilliard, ReliaStar, and Voya offered to, and did in fact, sell securities to Lowe, and specifically avers that "[t]he securities that Hilliard, Relia[S]tar, and Voya sold to [Lowe] were the ING Policies."  Compl. ¶¶ 388-89, ECF No. 51.  Lowe avers that, at the time the ING Policies were sold to Lowe in 2003, each of the ING Policies was a variable life insurance policy that constituted both an insurance policy and a security.  *Id.* at ¶ 390.

Lowe asserts that, in selling the ING Policies to Lowe, the Moving Defendants employed devices, artifices, or schemes to defraud Lowe, and further asserts that the Moving Defendants also engaged in acts, practices, or courses of business that operated as a fraud or deceit on Lowe.  *Id.* at ¶¶ 391-92.  Lowe avers that Hilliard, ReliaStar, and Voya made multiple material and untrue statements in offering and selling the ING Policies to Lowe, including that the ING Policies were appropriate and suitable for Lowe, that Lowe would accumulate significant cash surrender value

---

[8] The Court notes that a failure to respond to arguments set forth in a motion to dismiss supports the inference that those arguments are unopposed.  *See Massey v. Holman*, No. 1:17-CV-292, 2019 WL 3997845, at *6 (W.D. Pa. July 23, 2019), *report and recommendation adopted*, No. CV 17-292, 2019 WL 3997280 (W.D. Pa. Aug. 23, 2019), *motion for relief from judgment denied*, No. CV 17-292, 2020 WL 2747600 (W.D. Pa. May 27, 2020) ("'To put it simply: plaintiffs who fail to brief their opposition to portions of motions to dismiss do so at the risk of having those parts of the motions to dismiss granted as uncontested.'  Massey's failure to defend his claims suggests that he has abandoned those theories of liability." (internal citation omitted) (*quoting Lada v. Delaware County Community College*, 2009 WL 3217183, at *10 (E.D. Pa. Sept. 30, 2009))).  This Court will grant the Moving Defendants' Motions with respect to Lowe's federal securities fraud claims based upon consideration of the arguments set for in those Motions with respect to the applicable limitations periods, and not simply because those arguments are seemingly uncontested.  The Court merely points to Lowe's failure to substantively respond to the Moving Defendants' arguments as another basis justifying dismissal of the federal securities fraud claims set forth in Count X.

through the ING Policies, and that the ING Policies would provide a death benefit payable to her children.  *Id.* at ¶ 393. Lowe further alleges that, during the application process for the ING Policies, Hilliard, ReliaStar, and Voya failed to provide required disclosures to Lowe, failed to properly complete the application process through which suitability obligations are addressed, and failed to provide illustrations at the time of the execution of the applications for the ING Policies. *Id.* at ¶ 394.

Lowe asserts that Hilliard, ReliaStar, and Voya, together with Bedillion, participated in a scheme to sell unnecessary and unsuitable variable insurance products to Lowe, and characterizes this scheme as a device and artifice intended to defraud Lowe.  Compl. ¶ 395, ECF No. 51.  Lowe avers that the Moving Defendants' "untrue statements regarding the suitability of the insurance and investment product features of the ING Policies were material to [Lowe's] decision to obtain each of those policies[,]" and further avers that she did not know, and, in the exercise of reasonable care, could not know, that the Moving Defendants' statements were untrue.  *Id.* at ¶ 396-97.  Lowe alleges that Hilliard, ReliaStar, and Voya failed to issue the requisite accurate and truthful disclosures, in addition to other material information, prior to issuing the ING Policies to Lowe. *Id.* at ¶ 398.  Lowe asserts that the ING Policies remained in place in premium offset through 2016, when the ING Policies were surrendered.  *Id.* at ¶ 399.  Lowe further avers that she has suffered damages in excess of $400,000 as a result of Moving Defendants' violations of federal securities laws. *Id.* at ¶ 400.

With respect to private federal securities fraud claims, the Supreme Court of the United States has explained:

> Private federal securities fraud actions are based upon federal securities statutes and their implementing regulations.  Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the "use or employ[ment] ... of any ... deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in

contravention of" Securities and Exchange Commission "rules and regulations." 15 U.S.C. § 78j(b).

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005).  Securities and Exchange Commission Rule 10b-5 further provides that it is unlawful for any person, directly or indirectly:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  "To state a viable claim of securities fraud pursuant to Rule 10b–5, a plaintiff is required to plead: (1) a material misrepresentation or omission; (2) made with a wrongful state of mind; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Novinger Grp., Inc. v. Hartford Ins., Inc.*, 514 F. Supp. 2d 662, 672 (M.D. Pa. 2007) (citing *In re Suprema Specialties, Inc. Secs. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006)).

The applicable limitations periods for private federal securities fraud claims are set forth as follows:

> [A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than the earlier of—
>
> (1) 2 years after the discovery of the facts constituting the violation; or
>
> (2) 5 years after such violation.

28 U.S.C. § 1658(b).  The shorter time period provided by Section 1658(b)(1) sets forth a statute of limitations, and the longer time provided by Section 1658(b)(2) sets forth a statute of repose.

*In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 199 (3d Cir. 2007).  For a §10(b) claim to accrue, there must be an exchange of securities.  *In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d at 200.  The five-year statute of repose, however, begins to run on the date of the alleged misrepresentation.  *Id*.  The statute of repose under Section 1658(b)(2) provides "an unqualified bar on actions instituted '5 years after such violation,' giving defendants total repose after five years . . . ."  *Merck & Co. v. Reynolds*, 559 U.S. 633, 650 (2010) (internal citation omitted).  As such, this statute of repose is not subject to equitable tolling.  *See Merck*, 559 U.S. at 650 (referring to Section 1658(b)(2)'s statute of repose as an "unqualified bar," and citing a case for the proposition that a "comparable bar [is] not subject to equitable tolling."); *see also California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2055 (2017) (holding that the "3–year time bar in § 13 of the Securities Act is a statute of repose" which "displaces the traditional power of courts to modify statutory time limits in the name of equity.").

As stated above, the Moving Defendants assert that Lowe's federal securities fraud claims are time-barred by 28 U.S.C. § 1658(b).  With respect to affirmative defenses such as statutes of limitations or repose, "Federal Rule of Civil Procedure 8 does not require that a complaint anticipate or overcome affirmative defenses such as the untimeliness of a claim; 'thus, a complaint does not fail to state a claim simply because it omits facts that would defeat a statute of limitations defense.'"  *Germinaro v. Fid. Nat. Title Ins. Co.*, 107 F. Supp. 3d 439, 449 (W.D. Pa. 2015) (quoting *Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014).  "Dismissal under Rule 12(b)(6) pursuant to a statute of limitations is proper only 'where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading.'"  *Weiss v. Bank of Am. Corp.*, 153 F. Supp. 3d 831, 838 (W.D. Pa. 2015) (quoting *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.1 (3d Cir. 1994)).  A court

may dismiss a claim as time-barred "'if it is plain on the face of the complaint that the limitations period cannot be tolled' or if plaintiffs fail to 'plead the applicability of the [tolling] doctrine.'" *Weiss*, 153 F. Supp. 3d at 838 (quoting *Menichino v. Citibank, N.A.*, 2013 WL 3802451, *6–7 (W.D. Pa. July 19, 2013)).

Following review of the relevant briefing and Lowe's Complaint, and accepting as true all well-pled factual allegations in the Complaint and viewing them in a light most favorable to Lowe, the Court finds that the Complaint facially shows noncompliance with the limitations period applicable to Lowe's federal securities fraud claims against the Moving Defendants, and further finds that it is plain on the face of the Complaint that the limitations period at issue cannot be tolled. Initially, the only alleged securities involved in this action are the ING Policies. *See* Compl. ¶ 389 ("The securities that Hilliard, Relia[S]tar, and Voya sold to Marie were the ING Policies."); *see also id.* at ¶¶ 367-68; 388-89; 584. Lowe purchased the ING Policies in 2003. *Id.* at ¶ 254. Lowe's claims relating to the unsuitability of the ING Policies, as well as the Policies' inability to achieve their stated purposes, namely family protection, retirement planning, the accumulation of significant cash value, generation-skipping, and charitable contributions, all stem from alleged acts and/or misrepresentations or omissions of material fact that allegedly occurred during the application and underwriting processes which ultimately resulted in the acquisition of the ING Policies. *See* Compl. ¶¶ 78-80; 86-87; 96-99; 102-105; 108; 124; 126-28; 137-38; 144-47; 390-98, ECF No. 51. Lowe's federal securities fraud claims arise out of the Moving Defendants' alleged fraud and deceit leading up to the eventual acquisition of the ING Policies, which, again, were purchased in 2003.

In light of the above, the statute of repose for a federal securities fraud claim arising out of any such fraudulent or deceitful misrepresentation, omission, or act in connection with the 2003

purchase of the ING Policies began to run, at the latest, in 2003. Lowe commenced this action in July of 2019, *see* Notice of Removal ¶ 2, ECF No. 1, well outside the five-year limitations period provided by 28 U.S.C. § 1658(b)(2). As such, the Court finds that Lowe's federal securities fraud claims against Hilliard, ReliaStar, and Voya are barred by applicable limitations period, and that Lowe fails to state a claim for relief for federal securities fraud against Hilliard, ReliaStar, or Voya that is plausible on its face.[9] The Court further finds that amendment of these claims would be futile, and will thus dismiss Lowe's federal securities fraud claims against Hilliard, ReliaStar, and Voya with prejudice. In so holding, the Court need not, and does not, make any finding as to whether the ING Policies were, in fact, securities as defined by the Securities and Exchange Act of 1934.

Having so held, the Court notes that this holding is seemingly equally applicable to Lowe's claim for federal securities fraud (Count IX) against Bedillion,[10] as the operative facts supporting

---

[9] The Court notes that Lowe's Complaint also sets forth an averment in support of her federal securities fraud claims against the Moving Defendants which states, in conclusory fashion, that "[b]ecause the ING Policies remained in place on premium offset, there were continuing violations through at least 2016 when the ING Policies were finally surrendered." Compl. ¶ 399, ECF No. 51. The Court again notes that Lowe, in opposing the Moving Defendants' Motions to Dismiss, fails to address the Moving Defendants' argument that the five-year statute of repose bars Lowe's federal securities fraud claims, and this includes a failure to point to this averment in her Briefs in Opposition. The Court further notes that 28 U.S.C. § 1658(b)(2)'s statute of repose begins to run on the date of the alleged misrepresentations at issue, which, in this action, occurred in 2003. *In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d at 200. To the extent that Lowe relies on Bedillion and Valentic's alleged promise to surrender the ING Policies in 2009, and their alleged failure to do so, in asserting her claims for federal securities fraud against Hilliard, ReliaStar, and Voya, the Court notes that Bedillion and Valentic allegedly arranged for the ING Policies to go into premium offset in either late 2009 or early 2010. *See* Compl. ¶¶ 160-63, ECF No. 51. To the extent that these alleged fraudulent acts are sufficiently connected to the purchase or sale of securities, an issue which this Court need not decide at this juncture, the five-year statute of repose had also expired with respect any such asserted violation by the time Lowe commenced this action in 2019. Moreover, Bedillion expressly informed Lowe, in 2016, *see id.* at ¶¶ 198-200, that the ING Policies had not been surrendered in 2009, were still in effect, and had maintained limited cash value. *Id.* at ¶ 199. As such, Lowe was informed in 2016 that the ING Policies had not actually been surrendered in 2009. *Id.* 28 U.S.C. § 1658(b)(1) provides for a statute of limitations of "2 years after the discovery of the facts constituting the violation." Accordingly, had this Court not found that the Moving Defendants' Motions to Dismiss should be granted as to Lowe's federal securities fraud claims on the basis that such claims are time-barred because they are based on alleged fraudulent acts that occurred in 2003, the Court would have found that any federal securities fraud claims against Hilliard, ReliaStar, and Voya related to the alleged premium offset strategy are otherwise time-barred for the reasons set forth in this footnote.

[10] Bedillion has raised the defense of the applicable limitations periods provided by 28 U.S.C. § 1658 in his Answer to Lowe's Complaint. Answer and Affirmative Defenses 28, ECF No. 68.

the two claims are substantively identical, in that Lowe's claims relating to the unsuitability of the ING Policies, as well as the Policies' inability to achieve their stated purposes, arise from alleged fraudulent acts and/or misrepresentations or omissions of material fact that allegedly occurred during the application and underwriting processes which ultimately resulted in the purchase of the allegedly unsuitable ING Policies.[11]  *See* Compl. ¶¶ 367-81, ECF No. 51.  The Court notes that, "[w]hile sua sponte dismissals for failure to state a claim upon which relief can be granted 'should be dispensed sparingly,' sua sponte dismissals may be appropriate where the party's claim is 'patently meritless and beyond all hope of redemption.'"  *Dunk Rizzo v. Carty*, No. ST-09-CV-136, 2014 WL 1863517, at *1 (V.I. Super. Apr. 28, 2014) (quoting *Gonzalez–Gonzalez v. U.S.*, 257 F.3d 31, 33 (1st Cir. 2001); *Chute v. Walker*, 281 F.3d 314, 319 (1st Cir. 2002)).  The Third Circuit has explained that "[g]enerally, a district court may sua sponte dismiss a complaint under Rule 12(b)(6) after service of process only if the plaintiff is afforded an opportunity to respond." *Bethea v. Nation of Islam*, 248 F. App'x 331, 333 (3d Cir. 2007) (citing *Oatess v. Sobolevitch*, 914 F.2d 428, 430 n. 5 (3d Cir.1990)); *see also Dougherty v. Harper's Magazine Co.*, 537 F.2d 758, 761 (3d Cir. 1976) ("While no motion to dismiss had been filed, a district court may, in appropriate circumstances, note the inadequacy of the complaint and, on its own initiative, dismiss the complaint." (quoting *Literature, Inc. v. Quinn*, 482 F.2d 372, 374 (1st Cir. 1973))).

---

[11] The Court notes that Lowe's Complaint also contains an averment identical to that which was discussed above in Footnote 9.  *See* Compl. ¶ 382, ECF No. 51.  The analysis set forth above, albeit in dicta, in Footnote 9 is seemingly equally applicable to Lowe's federal securities fraud claim against Bedillion.  Lowe also asserts two additional allegations in Count IX that were not set forth at Count X, specifically: (1) "Because the Guardian Policy remained in place until it was rolled over into the AIG Policy, there were continuing violations through at least 2016;" and (2) "Because the AIG Policy was obtained in 2016 through a Section 1035 rollover and remained in place until 2019, there were continuing violations until that time."  *Id.* at ¶¶ 383-84.  Lowe does not allege in her Complaint that the AIG Policy or the Guardian Policy were securities.  As discussed above, the only securities at issue in this case, as specifically pled by Lowe, were the ING Policies, *id.* at ¶¶ 367-68; 388-89; 584, and those Policies were surrendered in 2016, *id.* at ¶ 399.  Accordingly, as currently pled, there is no basis for this Court to consider the AIG Policy or the Guardian Policy to be securities.

Given the Court's holding that Lowe's federal securities fraud claims against Hilliard, ReliaStar, and Voya are time-barred and cannot be cured by amendment, and given the fact that Lowe's claim for federal securities fraud against Bedillion is seemingly substantively identical to her federal securities fraud claims asserted against Hilliard, ReliaStar and Voya, this Court is inclined to find that the federal securities fraud claim set forth at Count IX is "patently meritless and beyond all hope of redemption." *See Dunk Rizzo*, 2014 WL 1863517, at *1. Further, Lowe has effectively been provided notice of, and an opportunity to respond to, potential dismissal of her federal securities fraud claims on the basis of the applicable limitations periods by the Moving Defendants' Motions, but has elected not to directly address the arguments raised by the Moving Defendants. In an abundance of caution, the Court will provide Lowe an opportunity to address possible distinctions, if any, presented by her federal securities fraud claim against Bedillion that would cause this Court's above analysis to not apply to her federal securities fraud allegations against Bedillion. The Court notes that it is not extending an opportunity for Lowe to brief issues that this Court has already decided; but, rather an opportunity to attempt to distinguish the federal securities fraud claims at issue and dismissed herein respecting Moving Defendants and Lowe's federal securities fraud claims against Bedillion at Count IX. Pending the Court's decision regarding whether to dismiss the federal securities fraud claim set forth at Count IX, the Court will hold all Motions to Dismiss and issues raised therein in abeyance.

## IV.    Conclusion

For the reasons discussed above, Lowe's federal securities fraud claims set forth against Hilliard, ReliaStar, and Voya will be dismissed with prejudice. Lowe will be afforded an opportunity to respond the potential dismissal of the federal securities fraud claim set forth in Count IX. All pending Motions to Dismiss and remaining issues raised therein are held in

abeyance pending the Court's decision regarding this issue.   An appropriate Order of Court follows.

BY THE COURT:

s/*Robert J. Colville*
Robert J. Colville
United States District Judge

DATED: September 21, 2020

cc/ecf: All counsel of record